**Shawnta ROBERTSON, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2000–SC–0468–DG.

Supreme Court of Kentucky.

Aug. 22, 2002.

---

Michael C. Lemke, Louisville, for Appellant.

A.B. Chandler III, Attorney General, Frankfort, Samuel J. Floyd, Jr., Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for Appellee.

COOPER, Justice.

Michael Partin, a police officer employed by the city of Covington, Kentucky, was killed when he fell through an opening between the roadway and the walkway of the Clay Wade Bailey Bridge and into the Ohio River while in foot pursuit of Appellant Shawnta Robertson. Following a trial by jury in the Kenton Circuit Court, Appellant was convicted of manslaughter in the second degree for wantonly causing Partin's death, KRS 507.040(1), and was sentenced to imprisonment for six years. The Court of Appeals affirmed, and we granted discretionary review to further consider the circumstances under which criminal liability can be imposed upon a defendant for injuries or death directly caused by the volitional act of another.

At about 2:00 a.m. on January 4, 1998, Officer Brian Kane of the Kenton County Police Department attempted to arrest Appellant in Covington for possession of marijuana. Appellant broke free of Kane's grasp and began running north on Fourth Street toward the Clay Wade Bailey Bridge which spans the Ohio River between Covington and Cincinnati, Ohio. Kane radioed for assistance and pursued Appellant on foot "at a sprint." When Appellant reached the bridge, he vaulted over the concrete barrier between the roadway and the walkway and began running north on the walkway toward Cincinnati. Kane, who, at that point, was running on top of the concrete barrier jumped down to the walkway and continued his pursuit.

Meanwhile, Partin and two other Covington police officers, Steve Sweeney and Cody Stanley, responded to Kane's request for assistance and arrived at the bridge almost simultaneously in three separate vehicles. What was later determined to be Partin's police cruiser proceeded past the point where Appellant was running and stopped. Appellant then also stopped, reversed course, and began running back toward Kane. Kane ordered Appellant to "get down," whereupon, Appellant raised both hands above his head and fell to his knees in apparent submission. Kane got on top of Appellant and pulled his hands behind his back so as to apply handcuffs. While doing so, Kane thought he saw a shadowy movement or a flash in his peripheral vision. He then heard a voice say that "somebody's off the bridge."

Partin's vehicle was the first of the three police cruisers to reach the bridge. He stopped in the right northbound lane just beyond where Appellant was running on the walkway. Stanley stopped his vehicle directly behind Partin's vehicle, and Sweeney stopped in the left northbound lane, also behind Partin's vehicle. Sweeney and Stanley testified that they did not see either Appellant or Kane on the walkway and stopped only because Partin had done so. Both saw Partin exit his vehicle, proceed to the concrete barrier, place his left

hand on the barrier, then vault over the barrier "as if he had done it a million times before," and disappear. The concrete barrier was thirty-two inches high. The railing of the walkway was forty-three inches high. There was a forty-one-inch-wide open space between the concrete barrier and the walkway railing. Partin fell through the open space into the river ninety-four feet below. His body was recovered four months later.

## I. CRIMINAL CAUSATION.

No one will ever know why Partin fell through the opening between the concrete barrier and the pedestrian walkway. Perhaps, he did not realize the opening was there. Perhaps, he knew it was there and miscalculated his vault. Either way, however, his death resulted from his own volitional act and not from any force employed against him by Appellant. Whether Appellant's act of resisting arrest by unlawful flight from apprehension was a legal cause of Partin's death requires application of the provisions of KRS 501.020(3) (definition of "wantonly"), KRS 501.020(4) (definition of "recklessly"), and KRS 501.060 ("causal relationships").

KRS 501.020(3) defines "wantonly" as follows:

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense *when he is aware of and consciously disregards a substantial and unjustifiable risk* that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that *a reasonable person* would observe in the situation.... (Emphasis added.)

KRS 501.020(4) defines "recklessly" as follows:

A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense *when he fails to perceive a substantial and unjustifiable risk that the result will occur* or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that *a reasonable person* would observe in the situation. (Emphasis added.)

■ Thus, wantonness is the awareness of and conscious disregard of a risk that a reasonable person in the same situation would not have disregarded, and recklessness is the failure to perceive a risk that a reasonable person in the same situation would have perceived.

KRS 501.060 provides in pertinent part:

(1) Conduct is the cause of a result when it is an antecedent without which the result in question would not have occurred.

. . .

(3) When wantonly or recklessly causing a particular result is an element of the offense, the element is not established if the actual result is *not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware unless:*

(a) The actual result differs from the probable result only in the respect that *a different person* or different property *is injured or affected* or that the probable injury or harm would have been more serious or more extensive than that caused; or

(b) The actual result involves the same kind of injury or harm as the probable result and *occurs in a manner which the actor knows or should know is rendered sub-*

*stantially more probable by his conduct.*

(4) The question of whether an actor knew or should have known the result he caused was rendered substantially more probable by his conduct is an issue of fact.

(Emphasis added.)

Obviously, Appellant's unlawful act of resisting arrest by fleeing from apprehension was a "but for" cause of Partin's fatal attempt to pursue him by vaulting from the roadway of the bridge to the walkway. As noted by the 1974 Commentary to KRS 501.060, the issue then becomes primarily one of *mens rea.*

> Once an act is found to be a cause in fact of a result and a substantial factor in bringing about that result, it is recognized as the proximate cause unless another cause, independent of the first, intervenes between the first and the result. And even then the first cause is treated as the proximate cause if the harm or injury resulting from the second is deemed to have been reasonably foreseeable by the first actor.

Thus, the fact that Partin vaulted over the concrete barrier of his own volition does not exonerate Appellant if Partin's act was either foreseen or foreseeable by Appellant as a reasonably probable result of his own unlawful act of resisting arrest by fleeing from apprehension. Robert G. Lawson and William H. Fortune, *Kentucky Criminal Law* § 2–4(d)(3), at 74 (LEXIS 1998). And KRS 501.060(3)(a) clarifies that it is immaterial that it was Partin, as opposed to Kane or one of the other police officers, who fell from the bridge if such was a reasonably foreseeable consequence of the pursuit.

In *Phillips v. Commonwealth,* Ky., 17 S.W.3d 870 (2000), *cert. denied,* 531 U.S. 1016, 121 S.Ct. 577, 148 L.Ed.2d 494 (2000), we relied, *inter alia,* on KRS 501.060 in upholding the wanton murder conviction of a defendant who fired shots at an intended victim from inside a vehicle and thereby induced the intended victim to return fire and kill a passenger in the defendant's vehicle. We held that it was reasonably foreseeable that, if shots were fired at another person from inside a vehicle, the other person would return fire in the direction of the vehicle, thus endangering the lives of its other occupants. *Id.* at 875. Also illustrative is the pre-code case of *Sanders v. Commonwealth,* 244 Ky. 77, 50 S.W.2d 37 (1932), which upheld the manslaughter conviction of a defendant who had threatened his wife with a deadly weapon while they were in a moving vehicle, causing her to jump from the vehicle to her death—clearly a volitional act by the victim but a probable and reasonably foreseeable consequence of the unlawful act of the defendant.

In both *Phillips* and *Sanders,* a defendant applied unlawful *force* against another whose volitional response to that force caused the victim's death. The case *sub judice* is conceptually more similar to *Lofthouse v. Commonwealth,* Ky., 13 S.W.3d 236 (2000), which reversed the reckless homicide conviction of a defendant who applied no force against the victim but supplied cocaine and heroin to the victim whose self-ingestion of those drugs caused his death. The result reached by the plurality opinion in *Lofthouse* did not turn on the fact that the victim died as a result of his own volitional act. Rather, in reversing the conviction, the opinion emphasized the absence of any evidence that the defendant knew or should have known that ingestion of those drugs under those circumstances would probably cause the victim's death. *Id.* at 241. Here, as in *Lofthouse,* Appellant's *mens rea, i.e.,* what he knew or should have known with respect to the probable consequences of his con-

duct, is crucial to determining the issue of his criminal liability.

■ Analogous to this set of facts is the case where a person pursued by the police in a high speed motor vehicle chase is held criminally liable for the death of an innocent bystander accidentally struck by a pursuing police vehicle. *E.g., People v. Schmies*, 44 Cal.App.4th 38, 51 Cal.Rptr.2d 185 (1996); *State v. Anderson*, 270 Kan. 68, 12 P.3d 883 (2000); *State v. Lovelace*, 137 Ohio App.3d 206, 738 N.E.2d 418 (1999). In *People v. Schmies, supra,* the California Court of Appeal directly addressed the effect of the police officers' conduct vis-a-vis the criminal liability of the defendant.

[T]he negligence or other fault of the officers is not a defense to the charge against defendant. The fact that the officers may have shared responsibility or fault for the accident does nothing to exonerate defendant for his role. In short, whether the officers' conduct could be described with such labels as negligent, careless, tortious, cause for discipline, or even criminal, in an action against them, is not at issue with respect to the defendant here. In this sense the "reasonableness" of the officers' conduct, focused upon their point of view and their blameworthiness for the death, is not relevant.

*The issue with respect to defendant focuses upon his point of view, that is, whether the harm that occurred was a reasonably foreseeable consequence of his conduct at the time he acted.* Since the officers' conduct was a direct and specific response to defendant's conduct, the claim that their conduct was a superseding cause of the accident can be supported only through a showing that their conduct was so unusual, abnormal, or extraordinary that it could not have been foreseen.

*Id.* at 193–94 (emphasis added). Although California does not have a statutory equivalent of KRS 501.060, this common law analysis of causation is consistent with the principles embodied in our statute. Did the defendant commit an illegal act that induced the officer's response? If so, was that response reasonably foreseeable by the defendant at the time that he acted? The fault or negligence of the officer is not determinative of the defendant's guilt. However, the reasonableness of the officer's response is relevant in determining whether the response was foreseeable by the defendant. The more reasonable the response, the more likely that the defendant should have foreseen it. It is immaterial that the ultimate victim was the officer, himself, as opposed to an innocent bystander.

■ Here, the conduct that supports Appellant's conviction is not, as the Commonwealth suggests, his own act of vaulting over the concrete barrier. Partin was not present when that act occurred; thus, it was not reasonably foreseeable that he would have vaulted over the barrier in reliance on the fact that Appellant had done so without incident. (That analysis might have been appropriate if Officer Kane had fallen from the bridge when he followed Appellant onto the walkway.) The conduct that supports Appellant's conviction is the continuation of his unlawful flight when he obviously knew that Partin intended to pursue him (as evidenced by the fact that when he saw Partin's vehicle stop, he reversed course and began running in the opposite direction), and that, to do so, Partin would be required to cross the open space between the roadway and the walkway and thereby risk falling to his death. "The question of whether [Appellant] knew or should have known [that Partin's death] was rendered substantially more probable by his conduct is an issue of

fact." KRS 501.060(4). There was sufficient evidence in this case to present that fact to a jury. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991).

## II. JURY INSTRUCTIONS ON CAUSATION.

■ The trial judge gave the jury the basic instructions on manslaughter in the second degree and reckless homicide, accompanied by the definitions of "wantonly" and "recklessly," as set forth at 1 Cooper, *Kentucky Instructions to Juries (Criminal)* §§ 3.28 and 3.29 (4th ed. Anderson 1993). Appellant did not object to the instructions and did not request or tender a specific instruction on causation. RCr 9.54(2); *Commonwealth v. Duke,* Ky., 750 S.W.2d 432, 433 (1988). However, we conclude that the basic second-degree manslaughter and reckless homicide instructions do not sufficiently frame the issue of causation as defined in KRS 501.060. The definitions of wantonly and recklessly embody the "risk" element of KRS 501.060(3), but not the "substantially more probable" element of KRS 501.060(3)(b). More appropriate instructions on the issue of causation would have been substantially as follows:

### INSTRUCTION NO. 1

### SECOND–DEGREE MANSLAUGHTER

You will find the Defendant guilty of Second–Degree Manslaughter under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about January 4, 1998 and before the finding of the Indictment herein, he caused the death of Michael Partin by unlawfully fleeing from police apprehension,

AND

A. That the Defendant was aware of and consciously disregarded a substantial and unjustifiable risk that his conduct would result in Michael Partin's death, and that his disregard of that risk constituted a gross deviation from the standard of conduct that a reasonable person would have observed in the same situation;

OR

B. That the death of Michael Partin occurred in a manner that the Defendant knew was rendered substantially more probable by his conduct.

### INSTRUCTION NO. 2

### RECKLESS HOMICIDE

If you do not find the Defendant guilty of Second–Degree Manslaughter under Instruction No. 1, you will find him guilty of Reckless Homicide under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about January 4, 1998 and before the Indictment herein, he caused the death of Michael Partin by unlawfully fleeing from police apprehension,

AND

A. That the defendant failed to perceive a substantial and unjustifiable risk that his conduct would result in Michael Partin's death, and that the risk was of such nature and degree that his failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation.

OR

B. That the death of Michael Partin occurred in a manner which the Defendant should have known was rendered substantially more probable by his conduct.

Nevertheless, the instructions given by the trial court were more favorable to Appellant than those in the specimen instructions above because each of the trial court's instructions allowed the jury only one alternative for finding guilt instead of two. Thus, they were not prejudicial to Appellant and would have afforded no basis for a new trial even if the issue had been preserved. *Baze v. Commonwealth,* Ky., 965 S.W.2d 817, 823 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 685 (1998).

The dissenting opinion, post, asserts that the respective paragraphs B of these specimen instructions do not accurately describe the wanton or reckless mental states necessary for convictions of second-degree manslaughter or reckless homicide. In fact, the culpable mental states described in KRS 501.060(3) are neither inconsistent nor incompatible with those described in KRS 501.020(3) (definition of wantonly: *"is aware of* and consciously disregards a substantial and unjustifiable *risk* that the result will occur"), and KRS 501.020(4) (definition of recklessly: *"fails to perceive* a substantial and unjustifiable *risk* that the result will occur"). (Emphasis added.) Unfortunately, KRS 501.060(3) is written in double negatives which may account for some confusion. Disregarding the double negatives, however, the statute authorizes a finding of wantonness even if the actual result was not within the *risk* of which the actor *was aware* if the actor *knew* (was "aware," pursuant to the statute defining "knowingly," KRS 501.020(2)) that the actual result was rendered substantially more probable by his conduct; and authorizes a finding of recklessness even if the actual result was not within the *risk* which the actor *should have perceived* if the actor *should have known* ("perceived") that the actual result was rendered substantially more probable

by his conduct. Thus, KRS 501.060(3) contains alternative definitions of wantonness and recklessness to those set forth in KRS 501.020(3) and (4). Neither KRS 507.040 (manslaughter in the second degree) nor KRS 507.050 (reckless homicide) requires reference to KRS 501.020 as the source of the definitions of wantonness and recklessness. (The reason why we have not reached this conclusion "until today," dissent, post, at 842, is because this is a case of first impression with respect to this aspect of KRS 501.060.) The conduct element that the dissenting opinion perceives to be missing from the specimen instructions is found in the first paragraph of each specimen, *i.e.,* "he caused the death of Michael Partin by unlawfully fleeing from police apprehension." Subparagraphs A and B of each specimen contain the alternative definitions of the *mens rea* elements of wantonness and recklessness.

Accordingly, the judgment of conviction and the sentence imposed by the Kenton Circuit Court are affirmed.

GRAVES, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

GRAVES, J., also concurs by separate opinion.

KELLER, J., dissents by separate opinion, with LAMBERT, C.J., and STUMBO, J., joining that dissenting opinion.

GRAVES, Justice, concurring.

I concur with both Part I and Part II of the majority opinion. However, I write separately concerning Appellant's culpability.

Whether the act of running from an officer when one has been detained, standing alone if it results in the officer's death, would support a second-degree manslaughter conviction is a question we leave until

another day. The act of vaulting the gap between the roadway and the sidewalk is sufficiently wanton to support the jury's verdict in this case. Appellant was aware of the danger of the gap and consciously disregarded it when he jumped. Knowing he was being pursued by at least one officer on foot, Appellant had to assume any pursuing officer would attempt to follow him, also becoming susceptible to the risk. A gap of nearly 4 feet across a drop of 94 feet into moving water cannot be described as anything but a substantial unjustifiable risk. It is certainly logical for the jury to conclude that, when Appellant disregarded this risk to which he was subjecting those lawfully pursuing him, he grossly deviated from the standard of conduct that a reasonable person would observe.

KELLER, Justice, dissenting.

Although I agree with the majority's holding that the trial court properly denied Appellant's motion for a directed verdict of acquittal, I respectfully dissent from the majority's decision to affirm Appellant's conviction. I would remand the case for a new trial because—to use the majority's own words—the trial court's homicide instructions did "not sufficiently frame the issue of causation as defined in KRS 501.060."[1] In addition, I am greatly troubled that the sample instructions outlined in the majority opinion permit a jury to find a defendant guilty of Second–Degree Manslaughter or Reckless Homicide without finding that the defendant acted either wantonly or recklessly as those terms are defined in KRS 501.020. In contrast to the majority's view that the Kentucky Pe-

nal Code's causation provisions furnish an "alternative for finding guilt,"[2] I believe that KRS 501.060(2) and (3) place a further limitation on the imposition of criminal liability in addition to the requirement of a culpable mental state. Thus, those provisions "adopt criteria for determining when factual causation is insufficient for holding a defendant responsible for the results of his conduct (i.e., ... 'legal causation')."[3] Accordingly, I challenge the majority's conclusion that Appellant suffered no prejudice from the trial court's failure to instruct the jury as to KRS 501.060's limitations on criminal liability, and I would reverse Appellant's conviction for Second–Degree Manslaughter and remand the case to the trial court for a new trial.

KRS 507.040(1) defines the offense of Second–Degree Manslaughter and states, in relevant part, "[a] person is guilty of manslaughter in the second degree when he *wantonly* causes the death of another person ...."[4] Until today, this Court has always held that "wantonly" as used in KRS 507.040(1) refers to the definition of the "wantonly" culpable mental state contained in KRS 501.020(3). Because the instruction proposed by the majority opinion employs the disjunctive "OR" between subparagraphs (A) and (B), however, a jury could find a defendant guilty of Second–Degree Manslaughter under the proposed instruction without ever finding that the defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk"[5] that his conduct would result in another's death or that "[t]he risk [was] of such nature and degree that disregard thereof constitute[d] a gross devia-

---

**1.** Majority Opinion at 750 S.W.3d 432, 433.

**2.** *Id.* at 838.

**3.** Robert G. Lawson and William H. Fortune, *Kentucky Criminal Law*, § 2–4(a)(4), at 65

(LEXIS 1998) (hereinafter "Lawson & Fortune").

**4.** KRS 507.040(1) (emphasis added).

**5.** KRS 501.020(3).

tion from the standard of conduct that a reasonable person would observe in the situation." [6] Although subparagraph (A) defines "wantonly" substantially in accordance with KRS 501.020(3)—omitting, however, the "of such nature and degree" language—the instruction permits a jury to return a guilty verdict under subparagraph (B), which incorporates language from KRS 501.060 and reads "[t]hat the death of Michael Partin occurred in a manner that the Defendant knew was rendered substantially more probable by his conduct," without determining that Appellant acted wantonly with respect to Officer Partin's death. While subparagraph (B) substantially paraphrases KRS 501.020(3)'s "knowingly" culpable mental state,[7] the culpable mental state required for Second–Degree Manslaughter is "wantonly," not "knowingly." And, unlike the other culpable mental states in KRS 501.020, the "knowingly" mental state "cannot serve as the culpable mental state for an offense having a prohibited result as its essential element." [8] While I have focused here upon the majority's proposed Second–Degree Manslaughter instruction, I would criticize its proposed Reckless Homicide instruction for the same reasons. Accordingly, I believe that the majority's proposed jury instructions as well as its disposition of this appeal betray a misunderstanding of KRS 501.060.

KRS 501.060 defines the causal relationships for which the Kentucky Penal Code permits the imposition of criminal sanctions:

(1) Conduct is the cause of a result when it is an antecedent without which the result in question would not have occurred.

(2) When intentionally causing a particular result is an element of an offense, the element is not established if the actual result is not within the intention of the contemplation of the actor unless:

(a) The actual result differs from that intended or contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm intended or contemplated would have been more serious or more extensive; or

(b) The actual result involves the same kind of injury or harm as that intended or contemplated and occurs in a manner which the actor knows or should know is rendered substantially more probable by his conduct.

(3) When wantonly or recklessly causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware unless:

(a) The actual result differs from the probable result only in the respect

---

6. *Id.*

7. *Commonwealth v. Griffin*, Ky., 759 S.W.2d 68 (1988).

8. Commentary to KRS 501.020 (Banks/Baldwin 1974). The KRS 501.020(1) definition of "intentionally" describes that mental state "with respect to *a result* or to conduct described by a statute defining an offense[.]" (emphasis added) And, the KRS 501.020(3) &

(4) definitions of "wantonly" and "recklessly" describe those mental states "with respect to *a result* or to a circumstance described by a statute defining an offense[.]" (emphasis added). In contrast, the KRS 501.020(2) definition of "knowingly" does not contain the word "result" and instead describes that mental state "with respect to conduct or to a circumstance defined in a statute defining an offense[.]"

that a different person or different property is injured or that the probable injury or harm would have been more serious or more extensive than that caused; or

(b) The actual result involves the same kind of injury or harm as the probable result and occurs in a manner which the actor knows or should know is rendered substantially more probable by his conduct.

(4) The question of whether an actor knew or should have known the result

he caused was rendered substantially more probable is an issue of fact.[9]

KRS 501.060's provisions relating to legal causation were adapted from Model Penal Code § 2.03, and, KRS 501.060(2)(b) and (3)(b), like the corresponding provisions in the Model Penal Code,[10] are designed "to *exclude* situations in which the manner in which the actual result occurs, or the nature of the actual result, is so remote from the actor's purpose or contemplation that it should have no bearing on the gravity of the offense for which he is convicted." [11] The 1974 Commentary to KRS 501.060 reflects that the drafters of

9. KRS 501.060.

10. The Model Penal Code provisions that correspond to KRS 501.060(2)(b) and (3)(b) and that address variances between the manner in which a prohibited result actually occurred and that contemplated or wantonly or recklessly risked, read:

(2) When purposely or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the purpose or the contemplation of the actor unless:

. . .

(b) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a [just] bearing on the actors liability or on the gravity of his offense.

(3) When recklessly or negligently causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of negligence, of which he should be aware unless:

. . .

(b) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability or on the gravity of his offense.

MODEL PENAL CODE § 2.03 (Official Draft and Revised Comments 1985) (hereinafter "MPC"). In contrast, KRS 501.060(2)(b) and

(3)(b) utilize language from an alternative draft of the Model Penal Code. *See* MODEL PENAL CODE § 2.03(2)(b), (3)(b) (Tent. Draft No. 4, 1955) (bracketed alternative formulation). Other than Kentucky, only Arizona has chosen this alternative language. *See* ARIZ. REV. STAT. ANN. § 13–203 (2001).

11. MPC § 2.03, comment 3 at 261 (emphasis added). "Actual result" is a term "meant to be contrasted with the designed or contemplated (or in the case of Subsection (3), the probable) result in terms of its specific character and manner of occurrence." MPC § 2.03, n. 13. *See also Note: Causation in the Model Penal Code*, 78 Columbia L.R. 1249, 1266 (1978):

While causation in fact represents a minimum precondition for a finding of liability, it is not in itself sufficient to establish liability, nor does it become adequate when supplemented by the culpability requirements of the offense in question. Hence special provisions are called for that prevent an actor from being held responsible when the outcome of his conduct differs greatly from that anticipated or risked, but that ensure liability when the divergence between the anticipated and actual outcome are sufficiently slight to be legally immaterial.

*Id.* (footnote omitted); Lawson & Fortune, *supra* note 3 at § 2–4(c)(3) at 69 ("KRS 501.060 is derived from the Model Code. It adopts one criterion by which causation questions are to be judged, requires no consideration of pre-existing physical conditions (or other specific factors), and clearly lays a foun-

the Kentucky Penal Code recognized that, under some circumstances, an actor with a requisite culpable mental state could, under a "but-for" analysis, factually "cause" a prohibited result, but should not be criminally sanctioned for that result:

This section deals with one of the most difficult problems in criminal law, that of causation. For an intelligible description of this provision and its purposes, a general statement of the law of causation to serve as a frame of reference is essential. That statement should begin with this proposition: any antecedent which contributes to a given result can be said as a matter of fact to have caused that result. For example, the birth of a person can be said to have caused his death even though the immediate death-causing act was one of shooting. In distinguishing between antecedents which should receive juridicial consideration as a cause in penal law and those which should not, the courts have classified causes as remote and proximate with only the latter sufficing for criminal liability. To be classified as a "proximate cause," generally recognized as a flexible standard, an antecedent must constitute a "substantial factor" in bringing about the result in issue. . . .

Once an act is found to be a cause in fact of a result and a substantial factor in bringing about that result, it is recognized as the proximate cause unless another cause, independent of the first, intervenes between the first and the result. And even then the first cause is treated as the proximate cause if the harm or injury resulting from the second is deemed to have been reasonably foreseeable by the first actor.

In attempting to deal with this law and the problem it represents. KRS

dation for a fresh approach to causation prob-

501.060, in its first subsection, starts with a simple rule of causation and an underlying judgment that many of the matters now treated as "causation" questions should be dealt with as problems of *mens rea*. The reason for this judgment can be best shown by use of the first example of the second preceding paragraph. It can be said that a person who gave birth to the victim of a homicide caused the death of that victim even though the immediate death-causing act was committed by another. Without the birth of the victim, the result in question would not have occurred. However, under no theory of *mens rea* can it be said that the mother of the victim had a criminal state of mind in causing the death. By treating such matters as *mens rea* problems, subsection (1) eliminates the need of distinguishing between "remote" and "proximate" causes and the difficulty inherent in the distinction.

*Subsection (2) deals in specific terms with the situation in which an actual result of criminal conduct varies from the result intended by a defendant. It first establishes a general principle that when such variation exists, "intentionally," as the essential element of culpability, cannot be shown. Then the subsection creates two exceptions to the general principle.* The first of which provides for two instances in which a variation between actual results and intended results is inconsequential: when the variation is that a different person or different property than intended is injured or affected by the criminal act (e.g., D. shoots at A with intent to kill him but instead kills B); and when the variation involves an actual injury or harm less serious or extensive than

lems in Kentucky.").

what was intended (e.g., D. shoots at V, intending to kill him, but instead only injures him). *The second exception to the general principle deals with the situation where an actual injury is the same as an intended injury but occurs in an "unintended" manner. To illustrate: suppose that D shoots his wife with intent to kill; that while in a hospital for treatment she contracts an unrelated disease, and that she ultimately dies as a result of that disease.* Under pre-existing doctrine, D's responsibility for this result depended upon whether the disease was considered an "independent intervening cause" and, if so, whether the result it caused was considered to have been "reasonably foreseeable." *Under this subsection, D's responsibility depends on whether the triers of fact find that his wife's death occurred in a manner which he knew or should have known was rendered substantially more probable by his conduct.* With this change in approach there is an express acknowledgment [subsection (4)] that the ultimate responsibility for determining whether an actual result is too far removed from an intended result to impose criminal liability must be left for the triers of fact.

Subsection (3) deals in specific terms with the situation in which an actual result of criminal conduct is outside a risk of which an actor was aware, if he acted wantonly, or of which he should have been aware, if he acted recklessly. It has the same general principle and the same exception as contained in subsection (2); therefore *the matters stated in the preceding paragraph are equally applicable to this subsection.*[12]

I believe it is important to emphasize that KRS 501.060 acts as a *limitation* on criminal liability in situations where a defendant otherwise intentionally, wantonly, or recklessly causes another person's death or physical injury or damage to property. KRS 501.060 represents a legislative policy determination that "[w]hen the requirement of 'proximate causation' dissociates the actor's conduct from a result of which it is a but-for cause, ... the actor's culpability with respect to the result ... is such that it would be unjust to permit the result to influence his liability or the gravity of his offense."[13] In other words, "legal causation," although now conceptualized by KRS 501.060 as an issue of *mens rea* or culpability, nevertheless operates to exclude criminal liability in cases where the defendant would otherwise have committed an offense, but "common sense notions of responsibility for the occurrence of results"[14] dictate that the imposition of criminal liability is inappropriate.

In *Lofthouse v. Commonwealth*,[15] this Court observed that KRS 501.060(3) frames the issue of causation "in terms of whether or not the result as it occurred was either foreseen or foreseeable by the defendant as a reasonable probability."[16] For instance, a defendant who shoots a rifle at his wife with the intention of killing her will—absent some other consideration such as a belief in the need to resort to self protection—be liable for Murder if a bullet

---

**12.** Commentary to KRS 501.060 (Banks/Baldwin 1974).

**13.** MPC § 2.03, comment 2 at 258.

**14.** *Note: Causation in the Model Penal Code, supra* note 11 at 1260. *See also* Lawson & Fortune, *supra* note 3 at § 2–4(c)(3) at 70 (characterizing the KRS 501.060(2) and (3)

determination as an "additional inquiry into the fairness of holding the defendant accountable for the [result].").

**15.** Ky., 13 S.W.3d 236 (2000).

**16.** *Id.* at 239 (quoting Lawson & Fortune, *supra* note 3 at § 2–4(d)(3) at 74).

strikes and kills her. KRS 501.060(2)(b), however, would likely exclude homicide liability in many cases where the defendant's aim was poor, but the defendant's conduct was nonetheless technically a "but-for" cause of his wife's death—e.g., where, because of the defendant's attempt upon her life, the wife vacates the marital residence and moves to a new home in the country and is later killed in a fall from a horse [17] or perishes in a fire when her new home burns down.[18] And, while a drunken driver may commit Second–Degree Manslaughter by consciously ignoring the risk that he might kill the occupants of another vehicle in a collision if a collision and death occur, KRS 501.060(3)(b) requires a jury to address foreseeability issues if the drunken driver collides with another vehicle without causing injury to the second vehicle's occupants, but those occupants are pinned within their vehicle and later devoured by a passing ravenous bear.[19]

Accordingly, where the evidence at trial presents an issue of fact as to whether the manner in which a prohibited result occurred was different from that intended or wantonly or recklessly risked—and *only* where the evidence presents such an issue—the trial court's instructions must frame the foreseeability issue for the jury. Because I believe the jury instructions proposed in the majority opinion are erroneous, I believe that the trial court in this case should have instructed the jury substantially as follows:

*INSTRUCTION NO. 1*

*SECOND–DEGREE MANSLAUGHTER*

You will find the defendant guilty of Second–Degree Manslaughter under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about January 4, 1998 and before the finding of the indictment herein, he caused the death of Michael Partin by fleeing from police apprehension,

AND

That in so doing:

A. The Defendant was aware of and consciously disregarded a substantial and unjustifiable risk that his conduct would cause Michael Partin to fall to his death through the opening between the roadway and the bridge, and that this risk was of such nature and degree that the Defendant's disregard of it constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

OR

B. (1) The Defendant was aware of and consciously disregarded a substantial and unjustifiable risk that his conduct would result in Michael Partin's death in some manner other than a fall through the opening between the roadway and the bridge, and that this risk was of such nature and degree that the Defendant's disregard of it constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

AND

(2) Michael Partin's death occurred in a manner which Defendant knew or

17. *See* MPC § 2.03, comment 2 at 258.

18. *See Note: Causation in the Model Penal Code, supra* note 11 at n. 53 (citing MODEL PENAL CODE § 2.03, Comment at 134 (Tent. Draft No. 4, 1955)).

19. *See United States v. Main,* 113 F.3d 1046, 1049 (9th Cir.1997) (using the bear as an example).

should have known was rendered substantially more probable by his conduct.

## INSTRUCTION NO. 2

### RECKLESS HOMICIDE

You will find the defendant guilty of Reckless Homicide under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about January 4, 1998 and before the finding of the indictment herein, he caused the death of Michael Partin by fleeing from police apprehension,

AND

That in so doing:

A. The Defendant failed to perceive a substantial and unjustifiable risk that his conduct would cause Michael Partin to fall to his death through the opening between the roadway and the bridge, and that this risk was of such nature and degree that the Defendant's failure to perceive it constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

OR

B. (1) The Defendant failed to perceive a substantial and unjustifiable risk that his conduct would result in Michael Partin's death in some manner other than a fall through the opening between the roadway and the bridge, and that this risk was of such nature and degree that the Defendant's failure to perceive it constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

AND

(2) Michael Partin's death occurred in a manner which Defendant knew or should have known was rendered substantially more probable by his conduct.

By proposing instructions that permit a jury to return a guilty verdict upon a finding only that the manner in which the result occurred was either foreseen or foreseeable to the defendant, however, the majority apparently interprets KRS 501.060(3)'s "the element is not established . . . unless" language as an alternative formulation of the culpable mental states defined in KRS 500.020(3) and (4). Stated differently, the structure of the majority's proposed instructions reflects either that the majority has either: (1) overlooked the necessity of requiring a wanton or reckless culpable mental state; (2) concluded that a defendant who acts "knowingly" also acts "wantonly" despite every indication to the contrary in the Kentucky Penal Code; or most likely, (3) has interpreted KRS 501.060(3)'s curious grammar as if it read "the element *is* established . . . *when*" and has equated Appellant's actual or imputed knowledge that the manner in which Michael Partin's death occurred "was rendered substantially more probable by his conduct" with wantonness and recklessness. I find a number of problems and pitfalls with the majority's interpretation.

First, other provisions and commentary to the Kentucky Penal Code caution against such an interpretation. Specifically, KRS 500.010(1) defines "culpable mental state" as " 'intentionally' or 'knowingly' or 'wantonly' or 'recklessly' *as those terms are defined in KRS 501.020.*" [20] KRS 501.050 states that a person can be guilty of a criminal offense "without having one (1) of the culpable mental states *defined in*

---

**20.** KRS 500.010(1) (emphasis added).

*KRS 501.020* "[21] only when the offense is a violation or misdemeanor without a defined culpable mental state[22] or when the offense is defined outside of the Kentucky Penal code and "the statute clearly indicates a legislative purpose to impose absolute liability for the conduct described."[23] Second–Degree Manslaughter does not fall within either exception. In addition, the 1974 Commentary to KRS 501.020 reads: "[n]either 'wantonness' nor 'recklessness' can be used to impose criminality upon conduct *unless the following two elements are shown to exist:* a substantial and unjustifiable risk that a result described in a penal statute will occur ... and a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[24] As subparagraph (B) of each the majority's proposed jury instructions permits a jury to find a defendant guilty of Second–Degree Manslaughter or Reckless Homicide without finding that the defendant acted wantonly or recklessly with respect to the victim's death, I believe those instructions are erroneous. Simply put, the language of KRS 501.060(3)(b) and KRS 501.020(3) are not interchangeable—a defendant's conscious disregard or reckless ignorance of a risk he or she knows or should know is rendered substantially more probable by his or her conduct does not necessarily "constitute[ ] a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[25] Accordingly, the majority's proposed instructions short-circuit the KRS 501.020 definitions of wantonly and recklessly.

Second, although the specific issue before the Court appears to be a question of first impression, the courts in Arizona—the other jurisdiction that adopted the alternative Model Penal Code version of Subsections (2)(b) and (3)(b)—have conceptualized the "legal causation" inquiry as distinct from the determination of whether the defendant possessed a culpable mental state.[26]

---

21. KRS 501.050 (emphasis added).

22. KRS 501.050(1).

23. KRS 501.050(2).

24. Commentary to KRS 500.020 (Banks/Baldwin 1974) (emphasis added). *See also* Commentary to KRS 507.020 (Banks/Baldwin 1974):

> The two offenses described by these provisions, murder by KRS 507.020(1)(b) and manslaughter in the second degree by KRS 507.040, have three elements in common: the conduct in question must have involved a substantial and unjustifiable risk of death to human life; the defendant, in causing the death in question, must have consciously disregarded that risk, and his disregard must have constituted "a gross deviation from the standard of conduct that a reasonable person would [have observed] in the situation." Taken together, these three elements constitute the culpable mental state *defined in KRS 501.020* as "wantonness" ....
>
> *Id.* (emphasis added).

25. KRS 501.020(3).

26. *See State v. Marty,* 166 Ariz. 233, 801 P.2d 468 (App.1990):

> There is abundant evidence in the record that the defendant acted "recklessly" as defined in A.R.S. § 13–105.
>
> . . .
>
> The *more difficult question* is whether the entire record contains some basis for finding that defendant's reckless behavior proximately and in fact caused Nuanez's death. In Arizona, both "but-for" causation and proximate cause must be established in a criminal case.
>
> *Id.* at 471 (emphasis added and citations deleted). *See also State v. Cocio,* 147 Ariz. 277, 709 P.2d 1336 (1985) (approving the trial court's legal causation separate instruction and finding that the trial court's failure to instruct the jury as to A.R.S. § 13–203(C)(2) [Arizona's parallel provision to KRS 501.060(3)(b) ] was not error because the case did not present a factual discrepancy between the actual and probable risks).

Finally, and perhaps most important, I believe the majority's interpretation of KRS 501.060(3)'s "the element is not established ... unless" language overlooks KRS 501.060's identical provision for result offenses requiring an intentional mental state. If, standing alone, actual or imputed knowledge that a result will occur in a manner rendered substantially more probable by the defendant's conduct constitutes "wantonness" or "recklessness," what ·of KRS 501.060(2)(b)?:

> When intentionally causing a particular result is an element of an offense, *the element is not established* if the actual result is not within the intention or the contemplation of the actor *unless:*
>
> . . .
>
> (b) The actual result involves the same kind of injury or harm as that intended or contemplated and occurs in a manner which the actor knows or should know is rendered substantially more probable by his conduct.[27]

Stated otherwise, if the majority correctly interprets KRS 501.060(3)(b)'s "the element is not established ... unless" language as an alternative articulation of the "wantonly" and "recklessly" culpable mental states, the same must hold true for KRS 501.060(2)(b), and an actor with actual or imputed knowledge that the manner in which the result actually occurred was rendered substantially more probable by his conduct would also have acted "intentionally." And, if that is the case, the same jury finding as to foreseeability could constitute two or three different culpable mental states. The logical response to this paradox is that, while the two inquiries are no doubt interrelated, a KRS 501.060(2)(b) or (3)(b) finding is neither interchangeable

nor co-extensive with the jury's determination of the defendant's culpable mental state. In my opinion, the 1974 Commentary to KRS 501.060 illustrates that the jury's subsection (2)(b) or (3)(b) foreseeability determination occurs subsequent to its determination of whether a defendant possessed a culpable mental state by intending or risking a prohibited result:

> To illustrate: suppose that D shoots his wife *with intent to kill;* that while in a hospital for treatment she contracts an unrelated disease, and that she ultimately dies as a result of that disease.... Under this subsection, D's responsibility depends upon whether the triers of fact find that his wife's death occurred in a manner which he knew or should have known was rendered substantially more probable by his conduct.[28]

As such, KRS 501.060(2)(b) and (3)(b) require an independent jury determination of foreseeability only *after* a factual determination has been made that the defendant intended (or wantonly or recklessly risked) the same kind of injury or harm in a different manner. And, as defined by statute, the foreseeability inquiry is the same—whether the defendant "knew or should have known" that the prohibited result was rendered substantially more probable by his conduct—regardless of whether the culpable mental state necessary for a result offense is "intentionally," "wantonly," or "recklessly."

Because I view KRS 501.060(3)(b) not as an "alternative for finding guilt," but as a separate limitation on the imposition of criminal liability for wantonly or recklessly risked results that occur in unforeseen manners, I disagree with the majority's conclusion that the trial court's failure to

---

27. KRS 501.060(2)(b) (emphasis added).

28. Commentary to KRS 501.060 (Banks/Baldwin 1974) (emphasis added).

instruct the jury as to the foreseeability question was harmless. KRS 501.060(4) establishes that the question of whether the manner in which Officer Partin was killed was within the foreseeable risks created by Appellant's conduct "is an issue of fact" [29] appropriate for jury resolution. However, the trial court's instructions in this case neither required nor permitted the jury to answer this factual question, and "[w]hen a jury is not told that it must find that the victim's death was within the risk created by the defendant's conduct an element of the crime has been erroneously withdrawn from the jury." [30] *The* central question at trial in this case was whether Appellant was criminally liable for Officer Partin's death, and, by omitting the inquiry required by KRS 501.060(3)(b), the trial court's jury instructions simply failed to present that issue adequately to the jury. As such, the jury could easily have predicated its finding of guilt on its belief that Appellant consciously disregarded not the risk that Officer Partin would fall to his death, but rather a risk that Officer Partin or another officer would be killed in another manner—e.g., by automobile traffic on the bridge (a theory the Commonwealth's brief advances as support for the trial court's ruling on Appellant's motion for directed verdict). Although Appellant did not tender proper jury instructions or otherwise preserve this error for our review, I believe "a substantial possibility exists that the result would have been … different" [31] if the trial court had properly instructed the jury. Thus, I would reverse the judgment of the Kenton Circuit Court and remand this indictment to the trial court for retrial on the charge of Second–Degree Manslaughter under proper instructions.

LAMBERT, C.J. and STUMBO, J., join this dissent.

---

**29.** KRS 501.060(4).

**30.** *United States v. Main, supra* note 19 at 1050.

**31.** *Jackson v. Commonwealth,* Ky.App., 717 S.W.2d 511, 514 (1986).